## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| Paula HANSON-HODGE, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 22-2818-BAH |
| Kilolo KIJAKAZI, Commissioner, Social Security Administration, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff, Paula Hanson-Hodge ("Plaintiff"), filed suit against Defendant, Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Defendant"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. This case arises out of an employment relationship between Plaintiff and Defendant, who is sued in her official capacity as the Acting Commissioner of the Social Security Administration ("SSA"). Before the Court is Defendant's motion to dismiss or, in the alternative, for summary judgment. ECF 20 ("Defendant's Motion"). Defendant's Motion also contains a memorandum of law and exhibits.[1] Plaintiff, proceeding *pro se*, includes numerous exhibits in her original complaint and in opposition to Defendant's Motion. ECF 1-2; ECF 24-2. The Court has reviewed all relevant filings, including Plaintiff's response in opposition to Defendant's Motion, ECF 22, and Plaintiff's supplement in

---

[1] The Court references all filings by their respective ECF numbers. Specific page references correspond with the ECF-generated page numbers at the top of page.

opposition to Defendant's Motion, ECF 24, and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the reasons stated below, Defendant's Motion is **GRANTED**.

## I.   <u>BACKGROUND</u>

The following facts are undisputed for the purposes of Defendant's Motion.  ECF 20-1, at 5–16; Fed. R. Civ. P. 56(c)(1)(B).  On October 31, 2022, Plaintiff filed the present action alleging that while she was employed as a Senior Paralegal with the SSA, her supervisors either discriminated against her as an African American woman or retaliated against her for filing complaints with the Equal Employment Opportunity Commission ("EEO" or "EEOC").  ECF 1 (complaint), at 1–2, 6–7.  Additionally, Plaintiff alleges that retaliatory harassment created a hostile work environment that violated Title VII.  *Id.* at 2.  Plaintiff's primary grievance is her placement on various performance improvement plans, which led to her eventual termination.  *Id.* at 9.

### A.   Employee Evaluations and Improvement Plans

At all times relevant to Defendant's Motion, the SSA used the Performance Assessment and Communication System ("PACS") to evaluate employee performance.  *See* ECF 20-1, at 6; ECF 20-8 (PACS Policy Manual); ECF 20-9 (2012 PACS Performance Plan) (documenting initial discussion under PACS plan); ECF 20-12 (2012 OPS Plan), at 2–8; ECF 20-19 (Notice of Proposed Removal).  This case concerns the SSA's use of the PACS, and thus, some background information on the PACS is helpful before addressing Defendant's Motion.[2]

---

[2] The district court in a prior Title VII case involving Plaintiff provided a similar tutorial on the PACS program in an opinion granting a motion for summary judgment.  *See Hanson-Hodge v. Colvin*, No. 1:14-CV-744, 2016 WL 595293, at *1–2 (E.D. Va. Feb. 11, 2016) ("*Hanson-Hodge I*"), *aff'd*, 653 F. App'x 176 (4th Cir. 2016) (mem.).

The PACS uses "a three-tier rating system for ratings on individual performance elements and for the summary appraisal rating." ECF 20-8, at 3. The three tiers include: "Level 5 (Outstanding Contribution), Level 3 (Successful Contribution) and Level 1 (Not Successful)." *Id.* at 4. Supervisors conduct annual appraisals of employee performance and consider numerous factors including numeric data. *Id.* at 15. Employees receive ratings on individual elements of their work performance and a summary appraisal rating. *Id.* A Paralegal Specialist is appraised on four elements: (1) interpersonal skills; (2) participation; (3) demonstration of job knowledge; and (4) ability to achieve business results. *See* ECF 20-9, at 2. In addition to receiving one of the three-tiered ratings on each element, an employee receives a summary appraisal. ECF 20-8, at 4. An employee's summary appraisal is never higher than the lowest element appraisal rating. *Id.* at 15–16. Thus, an employee with a Level 1 (Not Successful) rating "on any one element will be rated at the Not Successful (Level 1) Summary Level." *Id.* at 16.

If a supervisor assesses an employee with "marginal and failing performance," the PACS outlines a two-step process to facilitate improvement. *Id.* at 16. Step one includes enrolling the employee on a Performance Assistance ("PA")[3] plan. *Id.* Step two includes enrolling the employee on an Opportunity to Perform Successfully ("OPS") plan. *Id.* at 17.

When a supervisor identifies an employee's performance as marginal or failing, "the supervisor must meet with the employee." *Id.* at 16. In this initial discussion, the supervisor explains "the performance assistance process and give[s] specific examples of the performance problem." *Id.* The supervisor is required to "explain the expectations for improving performance to the Successful Contribution Level including the elements and performance standards involved,

---

[3] In the record, a PA plan is also referred to as a Performance Improvement Plan ("PIP"), or a Performance Assistance Plan ("PAP"). This Court will use the abbreviation "PA," as that is the abbreviation used in the PACS Manual.

and the employee's responsibilities." *Id.* In this discussion, the supervisor will also offer support to the employee such as "workload assistance, training, mentoring, and other appropriate support." *Id.* After the initial discussion, the employee "is allowed a 30 day calendar day period to successfully improve his/her performance." *Id.* The supervisor must develop a written PA plan that includes the "element(s) and expectation(s) in which the employee's performance is failing" and notification that the next step will be an OPS plan. *Id.* at 17. During the period of the PA plan, the employee is "considered to be performing at the Successful Contribution Level (Level 3)." *Id.* at 17. If at the end of a 30-calendar day period the employee meets performance standards, the employee is taken off the PA plan. *Id.* at 16–17.

However, "if the employee's performance does not improve and the employee does not successfully complete the PA plan, the supervisor *must* initiate the next step in the Performance Assistance process": an OPS plan. *Id.* at 17 (emphasis added). To do so, the supervisor "must meet with the employee and provide a written plan" that outlines critical elements for which performance is unacceptable, notify the employee that the employee is "not in good standing and any [Within Grade Increases] or career ladder promotion will be withheld for the duration of the plan," provide a "summary of assistance already provided, along with the result," provide a statement of the supervisor's plan to provide additional assistance, and notify the employee that "unless the employee's performance in the critical element(s) improves to and is sustained at an acceptable level, the employee may be reassigned, reduced in grade or removed from Federal service." *Id.* The OPS lasts "for a period of 120 calendar days," unless extended.[4] *Id.* at 18. "Employees are considered to be performing at the Not Successful Level (Level 1) while under an

---

[4] A supervisor may only extend the OPS period "if the employee is demonstrating significant progress towards the Successful Contribution Level of performance" and the extension period "should not be another 120 days." ECF 20-8, at 18.

OPS plan."  *Id.*  At the conclusion of the OPS period, a supervisor must initiate a "performance-based action, if, despite the additional assistance provided in accordance with the OPS plan, the employee's performance has not improved to the Successful Contribution Level by the end of the OPS plan."  *Id.*

### B.    The 70% Productivity Standard

As noted above, one of four elements that supervisors use to evaluate employee performance is "Achieves Business Results."  ECF 20-8 (PACS Policy Manual), at 7; ECF 20-9 (2012 PACS Performance Plan), at 2.  This element evaluates the extent to which the employee "produces a fair share of work according to supervisory expectations."  ECF 20-8, at 7; ECF 20-9 at 2.  Supervisors within the Office of Appellate Operations ("OAO") determined a "fair share" of work for a Paralegal Specialist equals a productivity level between 70% to 130% based on "the weighted actions and productivity computation method[5] attached to [a] performance plan."[6]  ECF 20-9 (2012 PACS Performance Plan); ECF 20-10 (Scale of Weighted Actions for OAO Analysts), at 2.

---

[5] In this formula, each employee task is assigned a time value that represents the average time needed to complete the task.  ECF 20-10 (Scale of Weighted Actions for OAO Analysts), at 2.  At the end of the month, each time-valued task is multiplied by the number of completed cases of that type by each employee.  *Id.*  The aggregate time value is then divided by the total number of hours spent on casework for each employee, to determine each employee's productivity rate.  *Id.*

[6] Plaintiff does not contest that this was the productivity requirement in her branch during the time that she received negative performance reviews; rather, Plaintiff challenges the legality of a 70% minimum productivity requirement.  *See* ECF 20-24 (September 2020 ALJ Decision), at 3 (noting that Plaintiff's underlying EEO complaint included an allegation of an "illegal production quota of 70%").  As this is a legal argument and not a factual argument, the Court will treat the fact that Plaintiff's branch required a minimum 70% productivity rating as uncontested.

### C.      Plaintiff's Employment History as a Paralegal Specialist

In October 2003, Plaintiff was employed by the SSA as a Paralegal Specialist.  ECF 20-4 (Affidavit of Paula Hanson-Hodge), at 1.  As a "senior Paralegal Specialist (Appellate and Civil Actions Analyst) and expert case analyst in the Office of Appellate Operations," Plaintiff's primary job responsibilities included reviewing disability decisions that had been appealed to the Agency's Appeals Council and preparing written recommendations and final action documents for SSA Administrative Law Judges ("ALJs").  ECF 20-5 (Social Security Administration Position Description), at 3–4.

In July 2005, Plaintiff was physically assaulted by another employee in the Medicare Subsidy Appeals unit.  *See Hanson-Hodge v. Colvin*, No. 1:14-cv-744, 2016 WL 595293, at *2 (E.D. Va. Feb. 11, 2016) ("*Hanson-Hodge I*"), *aff'd*, 653 F. App'x 176 (4th Cir. 2016) (mem.).  Plaintiff filed an EEO complaint that eventually settled in 2008.  *Id.*  Plaintiff remained employed at SSA, where she filed additional EEO complaints, including the one at the heart of this case.

Beginning in February 2009, Plaintiff's first line supervisor, Evelyn Gregory ("Gregory") placed Plaintiff on numerous PA plans based upon her failure to meet the 70% productivity standard.  *Id.*  On October 21, 2010, Gregory placed Plaintiff on an OPS plan based upon Plaintiff's continued failure to meet the productivity standard during a May 2010 PA plan.  ECF 20-13 (2010 OPS Plan), at 2–6.  Gregory left her position in December 2010 and Plaintiff's following two supervisors never removed Plaintiff from the OPS.  *Hanson-Hodge I*, 2016 WL 595293, at *3.  Thus, Plaintiff remained on the 2010 OPS for approximately two years until Roxie Rasey[7] ("Rasey") assumed the supervisor position.  *Id.*; ECF 20-16 (October 2012 Recission Letter), at 2.

---

[7] At the time Rasey's name was Roxie Ann Nicoll.  ECF 20-1, at 8.

On October 1, 2012, Rasey issued a memorandum officially ending the two-year OPS plan.[8]  ECF 20-16, at 2.  On December 12, 2012, Rasey and Plaintiff had a meeting in which Rasey explained Plaintiff's productivity level again did not meet the minimum 70% requirement and if it did not improve, a PA plan would be instated.  ECF 20-14, at 2.  On January 29, 2013, Rasey gave Plaintiff her fiscal year ("FY") 2012 appraisal.  ECF 20-18.  In the "Achieves Business Results" element, Rasey noted Plaintiff's cumulative productivity rate was 40.72%, but Rasey indicated she was rating Plaintiff as "successful" despite her past poor productivity level in the hope that Plaintiff would improve in FY 2013.  *Id.*

On March 11, 2013, Rasey placed Plaintiff on a PA plan because Plaintiff's productivity standards continued to fall below the minimum 70% expectation.  ECF 20-11 (2013 PA Plan), at 2–4.  In the PA plan, Rasey indicated which element Plaintiff was not meeting and outlined a plan for improvement, including weekly monitoring reports from Rasey and collaboration with a mentor who would assist Plaintiff in increasing productivity.  *Id.*  When Plaintiff's performance did not improve during the 30-day PA plan, Rasey placed Plaintiff on an OPS plan on April 12, 2013.  ECF 20-12 (2013 OPS Plan), at 2–8.  Again, Rasey identified with specificity that Plaintiff was not meeting the 70% standard, summarized assistance provided previously, and provided a plan for additional assistance to be provided during the OPS.  *Id.* at 2–8.  Rasey further notified Plaintiff that, while enrolled in the OPS plan, Plaintiff would not be in good standing, that Within Grade Increases ("WIGI") would be withheld, that Plaintiff would be ineligible for promotions, and that if Plaintiff's performance did not improve to an acceptable level, that Plaintiff may be

---

[8] Plaintiff does not contest that Rasey issued the letter.  *See* ECF 1.  Rather, Plaintiff disputes the legality of the letter.  ECF 1-2, at 3; ECF 1, at 8, 13.  This Court treats the fact that Rasey issued the letter as undisputed.

"removed from Federal service." *Id.* at 2, 7.  Plaintiff's OPS period ended on August 10, 2013. ECF 20-19, at 7.

On September 13, 2013, Rasey issued Plaintiff's FY 2013 performance appraisal.  ECF 20-19, at 8.  Rasey indicated under the element "Achieves Business Results" that Plaintiff did not meet the minimum 70% productivity standard from October 2012 to August 2013, and as a result, Plaintiff received an "unsuccessful (Level 1) in that critical element." *Id.*

On November 15, 2013, Rasey proposed Plaintiff's removal from service based upon Plaintiff's failure to meet the SSA's minimum productivity standard of 70%. *Id.*  On December 23, 2013, Plaintiff submitted a written response arguing the calculation of the production rate did not accurately measure her performance and argued that the 70% rating was illegal or invalid.  ECF 20-22 (Office of Federal Operations ("OFO") Decision), at 4; *see also supra* note 6.  On January 27, 2014, the Director of the OAO affirmed Plaintiff's removal.  ECF 20-22, at 4.

### D.   The Plaintiff's EEO Complaints and Appeals

Plaintiff filed numerous complaints stemming from her employment at the SSA, including (1) an EEO complaint in 2011, from which she received notice of her right to sue, and subsequently filed a Title VII complaint in the United States District Court for the Eastern District of Virginia; (2) an EEO complaint in 2013, from which she received notice of her right to sue, that prompted Plaintiff's filing of the present complaint; and (3) a complaint in 2014 related to Plaintiff's termination that is still pending before the Merit Systems Protection Board ("MSPB"), ECF 20-25 (February 2014 MSPB Appeal).

### 1.   Plaintiff's 2011 EEO Complaint and its Path to the United States District Court for the Eastern District of Virginia

After the October 2010 OPS enrollment, Plaintiff filed an EEO complaint.  *Hanson-Hodge I*, 2016 WL 595293, at *3.  In this EEO complaint, Plaintiff alleged Gregory was retaliating against

her for filing an EEO complaint in 2005 when Gregory placed her on a PA and OPS plan in 2010 and by denying her request to participate in the Flexiplace (telework) program. *Id.* On April 25, 2014, the SSA issued a Final Agency Decision ("FAD"), in which it found these actions did not constitute retaliation against Plaintiff. *Id.*; ECF 20-21. "After being issued a right to sue letter, Plaintiff filed her complaint in the [United States District Court for the Eastern District of Virginia], claiming violations of Title VII of the Civil Rights Act of 1964." *Hanson-Hodge I*, 2016 WL 595293, at \*3. In an amended complaint filed on February 23, 2015, Plaintiff alleged that her supervisor, Gregory, harassed Plaintiff, stole her case credits, and placed her on PA and OPS plans in retaliation for her filing the EEO complaint related to her physical assault by a previous supervisor that settled in 2008. *Id.* at \*3–4; ECF 20-23.

The SSA filed a motion for summary judgment that the district court granted on February 11, 2016. *Hanson-Hodge I*, 2016 WL 595293, at \*1. The district court held that Plaintiff failed to establish a prima facie case of retaliation under Title VII because Plaintiff failed to establish a causal relationship between the protected activity and the adverse employment action. *Id.*, at \*5–6. Additionally, the district court held that even if Plaintiff met her initial burden to establish a prima facie case of retaliation, the SSA "clearly and firmly established that it ha[d] a legitimate, nonretaliatory reason for placing Plaintiff on a PA[ plan] and an OPS plan." *Id.* at \*8. The Fourth Circuit affirmed the district court's opinion. *Hanson-Hodge v. Colvin*, 653 F. App'x 176 (4th Cir. 2016) (mem.), *cert. denied*, 580 U.S. 1004 (2016), *reh'g denied*, 580 U.S. 1157 (2017).

### 2. The 2013 Complaint and its Path to this Court

Plaintiff filed a separate EEO complaint on June 10, 2013, during the time Plaintiff was enrolled in an OPS plan by Rasey. ECF 20-24 (September 2020 ALJ Decision). She alleged discrimination in reprisal for past EEO activities and harassment surrounding her non-attainment

of the 70% productivity level.  ECF 20-24, at 4–5.  She contested her March 2013 placement on a

PA plan and her April 2013 placement on an OPS plan.  *Id.*

Specifically, Plaintiff's 2013 complaint, as summarized by the EEO ALJ, included the

following allegations:

1.  Since 2008, her supervisors have subjected her to stress by harassing her about completing more cases with an illegal production quota of 70%;

2. Since February 2011, she has not been permitted to work overtime;

3. On October 1, 2012, her supervisor gave her a document to sign regarding her EEO complaint;

4. Since October 2012, she has been called into her supervisor's office, on a weekly basis, and required to sign documents relating to her past and present EEO activity;

5. Since October 2012, she has been required to attend twice-weekly meetings to discuss the percentage of cases that she completes;

6. On March 11, 2013, she was placed on a Performance Improvement Plan (PIP);

7. On April 12, 2013, her supervisor informed her that her case completion rate was under 70%, placed her on an Opportunity to Perform Successfully (OPS) plan and gave her 120 days to improve her performance while her 2010 OPS was still in effect;

8. On April 16, 2013, her supervisor attempted to coerce her into signing a false certificate regarding her fiscal year 2010–2011 performance plans;

9. On September 13, 2013, Complainant's managers issued her a premature not successful rating;

10. On October 9, 2013, Complainant's managers told her that she was exempted from furlough and then escorted her from the office when she arrived;

11. On November 15, 2013, she received a notice of proposed removal; and

12. In fiscal years 2010–2013, she was not given a proper and legal Performance Assessment and Communications System (PACS) performance plan or rating.

ECF 20-24, at 4–5 (footnotes omitted).[9]

The EEO ALJ granted the SSA's motion for a decision without a hearing over Plaintiff's objection and issued a decision on September 30, 2020. *Id.* at 5. The ALJ found no merit to Plaintiff's complaint. *Id.* at 14–26. The SSA on October 23, 2020, issued a final order adopting the ALJ's findings. ECF 20-22. Plaintiff appealed this order to the EEOC Office of Federal Operations ("OFO") and on August 8, 2022, the OFO affirmed the SSA's finding of no discrimination. ECF 20-22 (OFO Decision). Plaintiff was notified in the OFO decision of her right to file a civil action in the United States District Court within ninety calendar days. ECF 20-22, at 12. Plaintiff timely filed this complaint on October 31, 2022.[10] *Id.* at 12.

3.   The 2014 MSPB Appeal Regarding Plaintiff's Termination

After receiving her termination letter in January 2014, Plaintiff appealed her termination to the MSPB on February 25, 2014. ECF 20-26 (MSPB Initial Decision), at 7. In that appeal, she challenged the validity of the SSA's performance standards, denied that the SSA communicated the standards to her, denied that her performance was unacceptable, and denied that she was given

---

[9] Neither party provides a copy of Plaintiff's 2013 EEO complaint. Defendant's Motion quotes the above language within the text of her motion, citing to the EEO ALJ's characterization of Plaintiff's complaints. ECF 20-1, at 12. This Court is satisfied that Plaintiff had sufficient notice of this characterization of the EEO allegations. Thus, the Court treats this characterization as undisputed. *See McCarthy v. Brennan*, 230 F. Supp. 3d 1049, 1063 n.10 (N.D. Cal. 2017) (considering initial intake forms where Plaintiff did not file a formal complaint with the court and contests the EEO's framing of his claims).

[10] Plaintiff's Complaint did not clearly express which of the articulated EEO complaints formed the basis of Plaintiff's Complaint in this Court; however, Plaintiff's Complaint mentions that she filed an EEO complaint in 2013 that was "escalated" to the EEOC in 2014. ECF 1, at 1–2. She then explains that after "several years of pendency at the Office of Federal Operations (OFO)," a decision was issued on August 8, 2022. ECF 1, at 2. It is clear to this Court that this decision is the subject of the Plaintiff's present Complaint. Given that the Plaintiff is proceeding *pro se*, the Court liberally construes her pleading and will analyze the claims arising from the 2013 EEO Complaint.

a meaningful opportunity to improve.  ECF 20-26 (MSPB Initial Decision), at 7.  On June 20, 2016, the MSPB affirmed the SSA's decision to terminate Plaintiff.  *Id.* at 32–33.  Plaintiff filed a petition for review of the MSPB's Initial Decision, ECF 20-29, which the MSPB granted.  ECF 20-28 (Second Initial Decision), at 2.  The MSPB vacated the initial decision and remanded the case for further action in light of a change in caselaw.  *Id.* (describing that the remand was in response to *Santos v. NASA*, 990 F.3d 1355 (Fed. Cir. 2021), which required the agency to provide justification for initially placing an employee on a PA plan).  The sole issue on remand was whether Plaintiff's performance leading up to the PA or OPS plans was unacceptable.  *Id.* at 6.

On March 14, 2023, the MSPB issued a Second Initial Decision, ECF 20-28, finding that the SSA established by substantial evidence that Plaintiff's performance was deficient in at least one critical element prior to being placed on a PA or OPS plan and that Plaintiff failed to establish her claims of retaliation as affirmative defenses by a preponderance of the evidence.  *Id.* at 22–23.  The SSA's termination decision was affirmed.  *Id.* at 23.  The Second Initial Decision would become final on April 18, 2023, unless Plaintiff filed a petition for review by that date.  *Id.*  Plaintiff filed a petition for review on April 18, 2023, ECF 20-29, and as such, the decision is not yet final.

## II.    LEGAL STANDARDS

When presented with a motion to dismiss or, in the alternative, a motion for summary judgement, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure."  *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020).  "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974) (citing *Carter v. Stanton*, 405 U.S. 669, 671 (1972)).  Reasonable opportunity requires that the

Court give the parties some notice that (1) "it is treating the 12(b)(6) motion as a motion for summary judgment[,]" and (2) that the opposing party has "the consequent right . . . to file counter affidavits or pursue reasonable discovery."  *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (internal citations omitted); *see also Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975).

In this case, Defendant's Motion is styled as a motion to dismiss under Rule12(b)(6) or, in the alternative, for summary judgment under Rule 56.  ECF 20-1.  Defendant has provided hundreds of pages of exhibits and the parties have been given a reasonable opportunity to present material pertinent to the Motion, as evidenced by Defendant's clear captioning of the Motion and by Plaintiff's opposition and supplemental opposition to Defendant's Motion.  *See* ECFs 22 and 24.  The Clerk's Office also mailed Plaintiff a "Rule 12/56 notice" after Defendant filed the Motion, ECF 21, and this Court routinely finds such notices satisfactory under *Roseboro v. Garrison*.  *See, e.g.*, *Terrell S. v. Kijakazi*, No. 22-2810-BAH, 2023 WL 5831180, at *2 (D. Md. Sept. 8, 2023) (collecting cases).  Thus, the Court exercises its discretion to evaluate Defendant's Motion as a motion for summary judgment.[11]

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*,

---

[11] The Court recognizes that Plaintiff initially had difficulty accessing Defendant's Motion because Plaintiff did "not have access to the [Court's] electronic filing system."  *See* ECF 22.  However, Plaintiff subsequently received a copy of Defendant's Motion on June 28, 2023, by mail.  ECF 24, at 2.  Plaintiff filed her supplemental motion nearly one month later on July 25, 2023.  ECF 24, at 3.  Since it is now over five (5) months since the filing of Defendant's Motion and Plaintiff has filed a robust response, this Court is satisfied that Plaintiff had sufficient notice of Defendant's argument and was "given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007).  At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

## III.   ANALYSIS

Defendant's Motion raises a variety of procedural and substantive arguments. Procedurally, Defendant asks this Court to dismiss some of Plaintiff's claims for lack of subject matter jurisdiction, due to Plaintiff's pending MSPB appeal.[12]  ECF 20-1, at 24–29.  Additionally, Defendant asks this Court to dismiss some of Plaintiff's claims that either were not timely raised,[13]

---

[12] On this point, Defendant's Motion appears to rely on caselaw that predates the Supreme Court's decision in *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1851 (2019).  ECF 20-1, at 24–26.  Under Title VII, administrative exhaustion is not jurisdictional.  *Id.*  Nevertheless, exhaustion is "a necessary step in pursuing the claim in [c]ourt."  *Conway v. Kijakazi*, No. 1:21-CV-00502-JRR, 2023 WL 5153641, at *6 (D. Md. Aug. 10, 2023) (quoting *Jackson v. United States*, No. 8:22-cv-00772, 2022 WL 6754671, at *2 (D. Md. Oct. 11, 2022)).  Therefore, Plaintiff's termination claim that is pending before the MSPB is not properly before the Court.  *See infra* note 16.

[13] Defendant's Motion discusses an EEO complaint, which Defendant refers to as "Case 0123."  ECF 20-1, at 21.  At issue in that complaint was the October 2010 denial of Plaintiff's request to telework and Plaintiff's enrollment on an OPS plan in 2010.  *Id.*  From this Court's understanding of the record, these claims were the basis of Plaintiff's Title VII complaint in the United States District Court of the Eastern District of Virginia.  *See Hanson-Hodge I*, 2016 WL 595293, at *3 ("After the 2010 events, Plaintiff filed another EEO complaint, alleging that Gregory was

or that are barred by res judicata and collateral estoppel.  ECF 20-1, at 21–24.  Alternatively,

Defendant argues Plaintiff's complaint cannot establish a prima facie Title VII case, and even if it

could, that Defendant has provided a legitimate reason supporting the SSA's actions.  ECF 20-1,

at 26–33.  Because Defendant's arguments prevail on the merits and because the precise overlap

of Plaintiff's complaints are unclear, the Court chooses not to wade too deeply into the procedural

morass that Defendant articulates in the first few sections of the Motion.

The Court is mindful of the well-established maxim that *pro se* pleadings are "liberally

construed and held to a less stringent standard than pleadings drafted by lawyers."  *Conway v.

Kijakazi*, No. 1:21-CV-00502-JRR, 2023 WL 5153641, at *4 (D. Md. Aug. 10, 2023) (citation

omitted); *Erickson v. Paradus*, 551 U.S. 89, 94 (2007)).  "Liberal construction means that the court

will read the pleadings to state a valid claim to the extent that it is possible to do so from the facts

available."  *Gray v. Wash. Metro. Area Transit Auth.*, Civ. No. DKC 16-1792, 2017 WL 511910,

at *2 (D. Md. Feb. 8, 2017) (citing *Barnett v. Hargett*, 174 F.3d 1128, 1132 (10th Cir. 1999)),

*aff'd*, 693 F. App'x 230 (4th Cir. 2017).  However, "the requirement of liberal construction does

not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a

claim currently cognizable in a federal district court."  *Miller v. Jack*, Civ. No. 1:06CV64, 2007

WL 2050409, at *3 (N.D. W. Va. July 12, 2007) (citing *Weller v. Dep't of Social Servs.*, 901 F.2d

387 (4th Cir. 1990)), *aff'd*, 261 F. App'x 540 (4th Cir. 2008).

Plaintiff's complaint alleges that the Defendant violated Title VII by: (1) discriminating

against her on the basis of her race, (2) retaliating against her on the basis of her past and ongoing

---

retaliating against her for filing an EEO complaint in 2005 by placing her on the PAP in May of
2010 and the OPS plan and by denying her request to participate in the Flexiplace [telework]
program.").  The timeliness of that case is not at issue in Plaintiff's current complaint.

EEO complaints, and (3) creating a retaliatory hostile work environment.  ECF 1.  For the reasons

below, this Court will grant Defendant's Motion for Summary Judgment as to these three claims.

### A.    Racial Discrimination Under Title VII[14]

Title VII of the Civil Rights Act prohibits status-based discrimination based on an

employee's personal characteristics such as "race, color, religion, sex, or national origin," 42

U.S.C. § 2000e–2 (a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013);

*Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018).  "A plaintiff pursuing a claim

under Title VII may either offer direct evidence of discrimination or, using indirect evidence, she

may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)."  *Strothers*, 895 F.3d at 327–28.  "Pursuant to

---

[14] "A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit. The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint."  *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022). "[F]actual allegations made in formal litigation must correspond to those set forth in the administrative charge.  Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit."  *Id.*  However, the Supreme Court explained in *Fort Bend County v. Davis* that Title VII's charge-filing requirement is not "of jurisdictional cast"; rather it is a claim-processing rule.  139 S. Ct. at 1851.  "A claim-processing rule may be 'mandatory' in the sense that a court must enforce the rule if a party 'properly raise[s] it.'"  *Id.* at 1849 (quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam)).

In this case, Plaintiff's 2013 EEO charge alleged only reprisal for prior protected EEO activity.  *See* ECF 20-22, at 4–5.  Plaintiff's administrative appeal contained no explicit mention of racial discrimination.  *Id.*  The first explicit mention of *racial* discrimination came in Plaintiff's complaint in this Court.  ECF 1, at 7.  Thus, Plaintiff's allegations regarding racial discrimination would generally not be before this Court.  *Walton*, 33 F.4th at 172.  However, while Defendant asks this Court to dismiss Plaintiff's claims for a variety of procedural reasons, Defendant does not argue that Plaintiff's race discrimination claim is beyond the scope of her EEO complaint.  *See* ECF 20-1, 21–26.  As such, the Court treats that argument as waived and proceeds to analyze the merits of her race discrimination claim.  *See Fort Bend Cnty.*, 139 S. Ct. at 1849 (noting failure to properly raise a claim-processing rule challenge will result in waiver).

the *McDonnell Douglas* standard, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination." *Conway*, 2023 WL 5153641, at *6 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

When a plaintiff is terminated due to misconduct or due to poor work performance, the plaintiff might allege either a discriminatory discharge claim, a discriminatory enforcement claim, or both. *Tims v. Carolinas Healthcare Sys.*, 983 F. Supp. 2d 675 (W.D.N.C. 2013) (discussing both); *Moore v. Penfed Title, LLC*, No. 1:20-CV-0867, 2021 WL 2004785, at *10 (E.D. Va. May 18, 2021) ("Discriminatory termination and discriminatory enforcement of employee disciplinary measures are separate causes of action."); *Jones v. Southcorr, L.L.C.*, 324 F. Supp. 2d 765, 776 n.11 (M.D.N.C. 2004) (noting that the "elements of [these] prima facie cases are different" and thus analyzing them separately in deciding a motion for summary judgment), *aff'd sub nom. Jones v. Southcorr, LLC*, 117 F. App'x 291 (4th Cir. 2004). Given the lack of specification in Plaintiff's pleadings, first, the Court must identify which type of claim to analyze.

Plaintiff alleged that the SSA "discriminated against [her] . . . when it decided to engage in disparate treatment by allowing other employees who were unsuccessful in their work performances to remain employed while the [SSA] <u>did not allow</u> [Plaintiff] who successfully performed her work to remain employed." ECF 1, at 6–7 (emphasis in original). Plaintiff stated the following regarding racial discrimination: "Whether race based because Paula Hanson-Hodge is an African-American woman has not been resolved by the EEOC nor the EEOC OFO; whether these actions taken by SSA is because [Plaintiff] was successful as an African-American or combination was not addressed." ECF 1, at 7. Liberally construing Plaintiff's claim, this Court will treat Plaintiff's racial discrimination claim as one based on discriminatory enforcement of disciplinary measures due to Plaintiff's express allegation of disparate treatment, and due to the

Court's above-mentioned determination that her termination cannot serve as the actionable adverse action to Plaintiff's Title VII claims while her MSPB appeal is pending.  *See infra* note16.

Plaintiff provides no direct evidence of racial discrimination, so this Court analyzes her claim under the *McDonnell Douglas* framework.  In a discriminatory enforcement context, a plaintiff establishing a prima facie claim of discrimination under *McDonnell Douglas* must allege: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012); *Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018); *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 392 (D. Md. 2002).  Plaintiff has alleged membership in a protected class, as she is an African American woman.  ECF 1, at 7.  However, Plaintiff has failed to establish that she maintained a "satisfactory job performance" and that she faced "different treatment from similarly situated employees outside the protected class."

### 1.    Satisfactory Job Performance

"In order to create a triable issue regarding the issue of satisfactory job performance, 'a plaintiff must proffer evidence of a genuine dispute concerning whether, 'at the time of h[er] [adverse employment action], [s]he was performing h[er] job in a way that met the legitimate expectations of [the defendant].'" *Ramseur v. Concentrix CVG Customer Mgmt. Grp. Inc.*, 467 F. Supp. 3d 316, 324 (W.D.N.C. 2020) (quoting *Reid v. Dalco Nonwovens*, LLC, 154 F. Supp. 3d 273, 285 (W.D.N.C. 2016)), *aff'd*, 837 F. App'x 204 (4th Cir. 2021).  "Specifically, the Court looks to the perception of the decision-maker in considering whether the employee was meeting job expectations at the time of dismissal." *Id.* (quoting *Reid*, 154 F. Supp. 3d at 285).

It is undisputed that Plaintiff was performing well below the 70% minimum productivity standard at the time of her placement on both the PA and OPS plans.  In the months preceding her PA plan enrollment, her cumulative productivity ranged from a low of 40.72% to a high of 55.3%.  ECF 20-11, at 2.  Plaintiff does not contest that she received these productivity ratings.  *See supra* note 6.

Additionally, numerous warnings of poor job performance from employer to employee offers strong indicia that a plaintiff is not meeting an employer's legitimate expectations.  *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002) (finding plaintiff failed to demonstrate satisfactory job performance where evidence of plaintiff's deteriorating job performance was "overwhelming" and despite repeated warnings, plaintiff failed to correct it).  Here, Plaintiff was warned in October 2012, December 2012, and January 2013 that her ratings were below the minimum threshold of acceptable productivity.  ECF 20-12, at 3.  Despite these warnings, Plaintiff's productivity level did not improve during the 30-day PA plan.  ECF 20-12, at 4.  For March 2013, Plaintiff's monthly productivity level was 37.17%.  ECF 20-12 (2013 OPS Plan), at 4.  Plaintiff's productivity level throughout the OPS ranged from 47.35% to 18.94%.  ECF 20-19 (Proposed Notice of Termination), at 8.

Plaintiff's assertion that she was "successful," and her assertion that she had received awards cannot create a genuine dispute of fact on this element in light of overwhelming evidence that Defendant believed Plaintiff was performing unsuccessfully prior to and during the performance improvement plans.  For instance, in *Peele v. Country Mutual Insurance Co.*, the Seventh Circuit declined to weigh a plaintiff's poor job performance against "favorable performance reviews, raises, and promotions" received in prior years because "when a district court evaluates the question of whether an employee was meeting an employer's legitimate

19

employment expectations, the issue is not the employee's past performance but 'whether the employee was performing well at the time of [her] termination.'"   288 F.3d at 329 (quoting *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)).   Defendant has provided clear evidence that Plaintiff was not.   Considering the facts in a light most favorable to Plaintiff, no trier of fact could reasonably find that Plaintiff was performing successfully before and during Plaintiff's placement on performance improvement plans, and therefore, Plaintiff has failed to establish a prima facie claim of discrimination on this basis.

> 2.   Different Treatment from Similarly Situated Employees Outside the Protected Class

Additionally, Plaintiff has failed to establish that other similarly situated employees outside of the protected class were treated differently.   Indeed, she has not affirmatively alleged that her race was the cause of her placement on PA and OPS plans.   ECF 1, at 7.   Instead, Plaintiff speculates that her race may have been a motivating factor in her supervisor's decision to place Plaintiff on numerous performance improvement plans.   *Id.*   "While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 767–68 (D. Md. 2010) (citing *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998)); *see also Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

In the disparate enforcement context, a plaintiff can meet her burden by pointing to similarly situated employees who received more favorable treatment.   *Coleman*, 626 F.3d at 190; *Spriggs*, 197 F. Supp. 2d at 392.   However, Plaintiff has failed to make such a showing.   *Id.*   While Plaintiff did allege that other employees with unsuccessful performance ratings were not

terminated, Plaintiff failed to allege that those employees were outside the protected class, as she did not allege the race of any similarly situated employee.  *See* ECF 1, at 6.

Courts in this circuit, including this one, routinely dismiss disparate treatment claims arising under Title VII when the plaintiff fails to allege that a similarly situated person outside the plaintiff's protected class was treated more favorably.  *See Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 394 (D. Md. 2002) (disposing of plaintiff's disparate enforcement claim because plaintiff failed to offer any evidence that any other employee was treated differently with respect to discipline or working conditions); *Cepada v. Bd. of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 510–11 (D. Md. 2011) (dismissing male plaintiff's disparate treatment claim when plaintiff alleged receiving less favorable teaching schedules because plaintiff failed to allege that a similarly-situated female or non African-American employee was promoted to that position); *see also Pannell v. Nicholson*, No. 7:06cv00088, 2008 WL 565098, at \*5 (W.D. Va. Feb. 29, 2008) (holding male plaintiff's disparate treatment claim failed because he had not shown that a similarly-situated female employee had been promoted to that position).  Thus, on this basis as well, Plaintiff has failed to meet her burden to establish a prima facie case of race-based discrimination.

In sum, because Plaintiff has failed to establish that her job performance met the Defendant's legitimate expectations, and because Plaintiff has failed to point to similarly situated individuals outside the protected class that received more favorable treatment, Plaintiff fails to establish a prima facie case for discrimination under Title VII.  Defendant's Motion for Summary Judgment as to Plaintiff's racial discrimination claim is, therefore, **GRANTED**.

### B.     Retaliation Under Title VII

A plaintiff bringing a retaliation claim under Title VII must first establish a prima facie case by showing: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers*, 895 F.3d at 327–28; *see also Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). "After the prima facie showing is made, '[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason.'" *Strothers*, 895 F.3d at 328 (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)). "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons," but, in fact, were pretextual. *Id.* (quoting *Foster*, 787 F.3d at 249). "A plaintiff who establishes a prima facie case of retaliation bears the ultimate burden of persuading the court that [she] has been the victim of intentional [retaliation]." *Foster*, 787 F.3d at 252 (internal citation and quotation marks omitted).

In this case, Plaintiff engaged in a protected activity by filing EEO complaints. *See Roberts v. Glenn Indus. Group, Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (holding that "Title VII prohibits an employer from retaliating against an employee for complaining about prior discrimination."). Defendant argues that "most" of Plaintiff's claims are not based on materially adverse actions, and that even if they were, Plaintiff cannot establish a causal nexus. ECF 20-1, at 29–31.

#### 1.     Materially Adverse Actions

To qualify as a materially adverse action in the retaliation context, the adverse action must be of the type that "might have dissuaded a reasonable worker" from engaging in protected activity.

*Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)[15]; *Strothers*, 895 F.3d at 327. While an adverse action "need not be employment or workplace-related in order to sustain a retaliation claim[,]" *Staggers v. Becerra*, Civ. No. ELH-21-0231, 2021 WL 5989212, at *20 (D. Md. Dec. 17, 2021), there must be "some direct or indirect impact on an individual's employment," *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015).

Plaintiff's adverse action allegations can be summarized as follows: (1) Rasey placed Plaintiff on PA and OPS plans in 2013; (2) Plaintiff was unable to work overtime due to her placement on PA and OPS plans; (3) Plaintiff was required to have meetings with Rasey to discuss Plaintiff's productivity level; (4) Plaintiff was asked by her supervisor to sign various documents; (5) on one occasion, Plaintiff was not exempted from furlough due to her OPS-enrollee status; and (6) Plaintiff received a proposed notice of termination in January 2014.[16]  ECF 20-24, at 3–4; *see supra* note 9.

---

[15] The Fourth Circuit has clarified that "the *Burlington Northern* 'materially adverse' standard applies to private employees and federal employees alike." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 216 (4th Cir. 2022).

[16] Plaintiff's 2013 EEO complaint included that she received a proposed notice of termination, which would make notice of her termination within the scope of this Court's review. ECF 20-22, at 4–5.  However, there is also some authority suggesting that a proposed termination notice merges with Plaintiff's ultimate termination. *Crowe v. Wormuth*, 74 F.4th 1011, 1033 (9th Cir. 2023) ("[T]here is some authority from the EEOC suggesting that . . . a *proposed* termination is nonetheless part of the mixed case and within the MSPB's jurisdiction.").  Plaintiff's challenge to her termination is still pending before the MSPB, and Plaintiff has not exhausted that administrative remedy.  ECF 20-29.  Though not jurisdictional, exhaustion of administrative remedies is nevertheless "a necessary step in pursuing the claim in [c]ourt." *Conway*, 2023 WL 5153641, at *6 (quoting *Jackson v. United States*, No. 8:22-cv-00772, 2022 WL 6754671, at *2 (D. Md. Oct. 11, 2022)) (holding proposed action merges with final action); *see also* U.S. Equal Employment Opportunity Commission, *Equal Employment Opportunity Management Directive For 29 C.F.R. Part 1614 (EEO-MD-110)*, Ch. 4 § II (Aug. 5, 2015) ("[A] proposed action merges with the decision on an appealable matter—for example, a proposed removal merges into the decision to remove.") (citing *Wilson v. Dep't of Veterans Affs.*, EEOC Appeal No. 0120122103 (Sept. 10, 2012)).  Defendant argues Plaintiff's termination cannot form the basis of Plaintiff's claims because that issue remains before the MSPB.  The Court agrees.

Plaintiff adequately alleges that her OPS plan enrollment constituted a materially adverse action.  While "poor performance evaluations alone do not constitute an adverse action unless those evaluations are used 'to detrimentally alter the terms or conditions of the recipient's employment,'" *Wedderburn v. Bd. of Educ. of Balt. Cnty.*, No. 8:19-CV-00215-PX, 2022 WL 504511, at *13 (D. Md. Feb. 18, 2022) (quoting *James v. Booz-Allen & Hamilton*, 368 F.3d 371, 377 (4th Cir. 2004)), here Plaintiff has alleged sufficient facts to support that her placement on an OPS plan was sufficient to deter a reasonable employee from pursuing protected action.  The record reflects that placement on an OPS leads to a variety of consequences including being disqualified from overtime opportunities,[17] being unable to receive WIGI pay raises, being disqualified from her branch's exemption to furlough,[18] and being disqualified from promotional opportunities and awards.  ECF 20-12 (2013 OPS Plan), at 7.  Plaintiff was also terminated from the SSA at the end of her OPS plan.  ECF 20-19.  However, the Court need not consider that fact in order to determine that Plaintiff's placement on an OPS plan was a materially adverse action. *See supra* note 16 (noting Plaintiff's termination claim is not before the Court).  The consequences

---

[17] Being denied overtime itself is not a materially adverse employment action when overtime is not an entitlement.  *See Lindsey-Grobes v. United Airlines, Inc.*, No. GJH-14-00857, 2014 WL 5298030, at *7 (D. Md. Oct. 14, 2014) ("Plaintiff's claimed entitlement to overtime wages was based entirely on speculation.  Such speculation cannot form the basis of an adverse employment action under these circumstances."); *see also Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996) (holding that an adverse employment action does not include an employer's denial of overtime where such benefit was purely discretionary and not automatically entitled); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 405–06 (S.D.N.Y. 2014) (African American female police officer's conclusory allegation that she was denied overtime, without more, was insufficient to substantiate an adverse employment action).  Plaintiff has not alleged that overtime was an entitlement.  ECF 1.

[18] Facts adduced before the EEO ALJ indicate the federal government shut down from October 1, 2013, to October 17, 2013, and only essential government employees were allowed to report to work, while all other employees were on furlough.  ECF 20-24 (September 2020 ALJ Decision), at 12.  Plaintiff was informed on October 9, 2013, that all employees on OPS plans were to be placed on furlough during the shutdown. *Id.* at 13.

of being enrolled in an OPS plan, such as being disqualified from promotion, raises, and overtime opportunities could easily dissuade a reasonable worker from engaging in a protected activity. *See Emami v. Bolden*, 241 F. Supp. 3d 673, 685 (E.D. Va. 2017) (finding plaintiff successfully alleged that placement on a performance improvement plan was a materially adverse action when plaintiff was "by virtue of [] placement on the PIP" subject to reduction in grade, which could dissuade a reasonable employee from making a charge of discrimination).

Whether placement on a PA plan constitutes a materially adverse action, on the other hand, is a closer question. While enrolled in a PA plan, the employee is still considered "successful (Level 3)," and the only change in employment that can result is disqualification from telework opportunities. ECF 20-14 (Flexiplace Program Supervisor Form-Disapproval). Plaintiff did not allege a lack of access to telework opportunities as part of her 2013 EEO complaint. ECF 1. Nevertheless, because the PA and OPS plans are factually intertwined as part of the PACS employee improvement system, the Court will analyze Plaintiff's placement on both PA and OPS plans in considering whether Plaintiff established a causal nexus between her EEO complaints and her placement on performance improvement plans.

The other activities Plaintiff alleges do not constitute materially adverse actions. Plaintiff's other complaints included having to attend frequent meetings and being asked to sign documents.[19]

---

[19] Plaintiff's EEO complaint alleged that Rasey asked her sign "EEO documents." ECF 20-24, at 3–4. While an employer forcing an employee to sign EEO documents could constitute an adverse action, Plaintiff fails to allege with specificity the types of documents she was asked to sign, or when she was asked to sign them. ECF 1. Plaintiff's affidavit does not include any allegation that Rasey made her sign EEO documents. ECF 20-4 (Plaintiff's affidavit). Rather, when asked to elaborate on the EEO documents by an investigator, Plaintiff made clear she was asked to "sign documents concerning the 2010–2011 appraisals." ECF 20-4, at 6–7. Appraisal documents are not EEO documents; they are part of the PACS employment evaluation system used by the SSA. ECF 20-8 (PACS Policy Manual). A prima facie case cannot be made on such vague and speculative statements.

ECF 20-24, at 3–4; *see supra* note 9.  Title VII does not protect against these types of everyday inconveniences.  *See Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 819 (E.D. Va. 2016) ("Title VII protects against adverse employment actions, not all workplace injustices."); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651–52 (4th Cir. 2002) (finding that "disciplinary discussion" prompted by employee's insubordination was not an adverse employment action for purposes of a retaliation claim under Title VII); *Prince-Garrison v. Md. Dep't of Health & Mental Hygiene*, 317 F. App'x 351, 353–54 (4th Cir. 2009) (per curiam) (holding failure to provide employee with office supplies, reprimands for insubordination, meetings with supervisors, and directions to attend counseling do not constitute adverse employment actions).

In sum, Plaintiff has established that she experienced a materially adverse action that affected her employment only when she was placed on a PA and OPS plan in 2013 because a reasonable employee might be dissuaded from engaging in a protected activity based on the consequences inherent in a PA and OPS plan.

## 2.    Causation at the Prima Facie Stage

The third element in a retaliation claim under Title VII requires a plaintiff to prove the protected activity was causally connected to the adverse action.  *Strothers*, 895 F.3d at 335.  A causal connection exists when an employer takes a particular adverse action "*because* the plaintiff engaged in a protected activity."  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (emphasis in original) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).  The causation standard at the prima facie stage is less "onerous" than in the pretext stage of the *McDonnell Douglas* framework.  *See Strothers*, 895 F.3d at 335 ("[E]stablishing a causal relationship at the prima facie stage is not an onerous burden."

(internal citation and quotation marks omitted)).  An employee may establish prima facie causation simply by showing that: "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity."  *Strothers*, 895 F.3d at 336 (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

i.  <em>Rasey's Knowledge of Plaintiff's EEO Complaints</em>

"[N]o causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity."  *Strothers*, 895 F.3d at 336 (citing *Dowe*, 145 F.3d at 657).  An employer is aware of an employee's protected activity when she "learns of an employee action that [s]he understood or should have understood to be opposition against a Title VII violation."  *Id.* (citing *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012)).  To determine whether the employer *should* have understood the nature of the employee's action, "courts examine not just the employee's complaint but also the factual context that is known to the employer."  *Id.* (citing *Okoli v. City of Balt.*, 648 F.3d 216, 224 (4th Cir. 2011)).

In this case, Rasey became Plaintiff's supervisor in June 2012 and was not present during the events that formed the basis of Plaintiff's earlier 2005 and 2011 complaints.  ECF 20-15, at 2. There is no direct evidence that Rasey was aware of Plaintiff's prior EEO activities.  Plaintiff speculates that because Paul Casey, Rasey's manager, was named in the 2010 and 2013 EEO cases, he could have informed Rasey of the prior EEO activities.  ECF 1, at 11.  Plaintiff does not explain how Rasey could have known about the 2005 complaint.

In *Strothers v. City of Laurel*, the Fourth Circuit held that the City of Laurel should have known that an employee was engaged in a protected activity when she sent an email to her supervisor that complained of harassment and a hostile environment. 895 F.3d at 336. Similarly, in this case, informal communications apprised Rasey of Plaintiff's EEO activities. ECF 1-2, at 3. While Rasey's affidavit suggests that she did not become aware of the EEO complaint against her until July 11, 2013, Rasey knew Plaintiff *intended* to file an EEO complaint as soon as March 11, 2013, when Plaintiff explicitly told Rasey of her plan to do so. ECF 1-2, at 3.[20] Then in a meeting on March 18, 2013, Plaintiff told Rasey she felt harassed. ECF 20-12 (OPS Plan), at 4 ("In our meeting of March 18, 2013, you indicated that you did not want to meet with me weekly about your productivity, that you considered the meeting to be harassment and that you wanted to be left alone."). Similar to *Strothers*, these informal communications put Rasey on notice of Plaintiff's intent to engage in a protected activity. *See Okoli*, 648 F.3d at 224 (concluding a supervisor "surely would have known" the nature of employee complaint because he was alleged harasser).

However, it is less clear if Rasey knew or should have known about Plaintiff's 2010 and 2005 EEO activities. Rasey stated she had no knowledge of Plaintiff's prior EEO complaints. ECF 20-15, at 6. Plaintiff speculates that because Gregory and Rasey had a common manager, Paul Casey, that Casey could have told Rasey of Plaintiff's 2010 complaints. ECF 1, at 11. Plaintiff provides no rationale for how Rasey could have known about Plaintiff's 2005 complaints. Without additional evidence to support Plaintiff's claim that Rasey also knew of the 2005 and 2010 complaints, it is unsupported conjecture that Rasey had knowledge of those complaints.

---

[20] The exhibit at ECF 1-2 is a March 11, 2013, email from Rasey to another colleague at the SSA noting that "[Plaintiff] told [Rasey that] she was going to EEOC, Labor Relations and Whistleblower about this."

However, for the reasons noted above, Plaintiff offers unrefuted evidence that Rasey knew of her 2013 EEO complaint.

*ii.*     *Temporal Connection Between Knowledge and Adverse Action*

The second step in this analysis requires a court to consider whether the employer took an adverse action against the employee soon after becoming aware of such activity. *Strothers*, 895 F.3d at 336 (holding one day between notification of intent to file a grievance and the employee's termination satisfied the causal connection requirement at the prima facie stage); *Carter*, 33 F.3d at 460 ("This court found a causal connection between a plaintiff's protected activity and her discharge where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed.").

In this case, Rasey learned of the protected activity on March 11, 2013.  ECF 1-2, at 3. Rasey placed Plaintiff on a PA plan that same day, but that decision had been forecast for six months as the necessary outcome if Plaintiff's productivity ratings remained below 70%.  ECF 20-12, at 3.  The earliest warning of this action came in October 2012, followed by an additional warning in December 2012, and a third warning in January 2013.  *Id.*  Finally, the email communication Plaintiff cites as an exhibit to her complaint, ECF 1-2, at 1, shows that Rasey informed Plaintiff of her intent to put her on a PA plan, which prompted Plaintiff to express her intent to file an EEO complaint.  *Id.*

Once Rasey learned of Plaintiff's intentions to engage in protected EEO activity, only one month passed before she placed Plaintiff on an OPS plan.  Ordinarily, this might indicate a causal connection sufficient to establish a prima facie case of retaliation.  *Cf. Carter*, 33 F.3d at 460 (noting four months between knowledge and adverse employment action can be sufficient to establish a prima facia case of retaliation).  However, the Court recognizes that the PACS manual

29

provides no discretion to supervisors to delay placement on an OPS plan once the performance improvement process begins.  ECF 20-8, at 16 (noting that supervisors can only extend the PA plan if the "employee is demonstrating a significant progress toward successful performance" and even then, the recommended extension is only "one or two weeks").  The manual states that a supervisor is required to implement an OPS plan if the employee fails to achieve and maintain an acceptable level of performance.  *Id.* at 17 ("If the employee's performance does not improve and the employee does not successfully complete the PA, the supervisor *must* initiate the next step in the Performance Assistance process." (emphasis added)).

It is thus a close question as to whether Plaintiff met her initial burden as to a causal connection between her protected activity and her placement on an OPS plan.  Assuming without deciding that Plaintiff has established a prima facie case of retaliation, the Court, nevertheless, finds that the Defendant established a legitimate, non-retaliatory reason for Plaintiff's OPS placement that Plaintiff has failed to rebut, as discussed below.

> 3.    Defendant has Established Legitimate, Non-Retaliatory Reasons for Plaintiff's PA and OPS Enrollment, Which Plaintiff has Failed to Rebut.

If a plaintiff satisfies her initial burden to demonstrate a prima facie case of retaliation, the burden flips to the defendant to produce a legitimate, nonretaliatory reason for the adverse employment action.  *Strothers*, 895 F.3d at 327–28.  In this case, Defendant provided evidence that Plaintiff consistently failed to meet the 70% productivity standard, and Plaintiff has failed to establish that this justification is pretextual.

> i.    *Defendant offers a legitimate, nonretaliatory rationale.*

Plaintiff's productivity levels before being placed on a PA plan in March 2013 were well below the 70% productivity rating required in her branch.  In the months preceding her PA plan enrollment, her cumulative productivity ranged from a low of 40.72% to a high of 55.3%.  ECF

20-11, at 2.  Plaintiff was warned in October 2012, December 2012, and January 2013 that her ratings were below the minimum threshold of acceptable productivity.  ECF 20-12, at 3.

Despite these warnings, Plaintiff's productivity level did not improve during the 30-day PA plan.  For March 2013, Plaintiff's monthly productivity level was 37.17%.  ECF 20-12 (2013 OPS Plan), at 4.  By that time, Plaintiff's cumulative productivity level had decreased to 37.82% for FY 2013, despite Rasey providing updates and offering assistance, which Plaintiff declined.  ECF 20-12, at 4.

Finally, Plaintiff's productivity level throughout the OPS plan and after was far below the necessary 70% threshold, never rising above 47.35% and reaching a low, in August of 2013, of 18.94%.  ECF 20-19 (Proposed Notice of Termination), at 8.  Plaintiff's cumulative productivity rating for FY 2013, even including pending matters that were not finalized, was also well below the 70% minimum threshold.  *Id.*  Despite enrollment in PA and OPS plans, Plaintiff's productivity rating consistently decreased from 55.23% in October of 2012 to 31.96% in August of 2013.  *Id.*  Plaintiff does not dispute these calculations and argues only that the 70% requirement was "illegal" as it relates to her and all other SSA employees.  ECF 1, at 9; ECF 20-22, at 3. As such, the Defendant has met her burden to establish a legitimate, non-retaliatory reason for Plaintiff's placement on PA and OPS plans.

ii.      *Plaintiff cannot establish that Defendant's rationale is pretextual.*

Because Defendant has satisfied her burden of production, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons," and were pretextual.  *Strothers*, 895 F.3d at 327–28.  The plaintiff "bears the ultimate burden of persuading the court that [she] has been the victim of intentional [retaliation]."  *Foster*, 787 F.3d at 252 (internal citation and quotation marks

31

omitted).   To carry this burden, a plaintiff must establish "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (quoting *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir.1995)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).   In other words, Plaintiff must show retaliatory animus was "the real reason" she was placed on PA and OPS plans.   *Foster*, 787 F.3d at 252 (concluding "the *McDonnell Douglas* framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action").

A few principles guide the Court's analysis of Plaintiff's evidentiary showing of pretext. First, the Court does not review the merits of a facially legitimate business decision; rather, the Court's focus in on whether the employer's rationale is "honestly believed."   *Argyropoulous v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (noting the court does not "sit as a super personnel review board that second-guesses an employer's facially legitimate business decisions; rather, it asks only whether the employer's explanation was honestly believed." (internal citation and quotation marks omitted)).   Second, in considering a plaintiff's evidentiary showing, the Court must disregard conclusory statements that have no factual support in the record.   *See CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658–59 (4th Cir. 2020) ("[The non-moving] party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004))); *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) ("It is true that self-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment.") (emphasis in original); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004) (concluding self-serving statements were insufficient to overcome summary judgment, particularly when faced with "overwhelming evidence" in opposition).

In this case, Plaintiff does not contest that her work productivity rating was under 70%.[21] ECF 1, at 9.  As noted, she claims in her EEO complaint that any 70% requirement was "illegal." ECF 20-22, at 3.  The Court will not second guess a facially legitimate business decision, and the SSA OAO Branch's decision to use a 70% minimum productivity rating as a metric to assess whether employees were contributing their "fair share" is facially legitimate.

Despite Plaintiff's poor productivity ratings, Plaintiff argues she was still performing successfully.  She says she received "Recognition of Contribution Awards, Commendable Act of Service Awards and numerous letters of appreciation from some Social Security Managers and from the general public."  ECF 1, at 10.  Though indicating parenthetically that she was attaching evidentiary support for this assertion, records supporting these alleged accolades were not attached.  *See* ECF 1-2.  Even taking Plaintiff's assertions as true and interpreting all inferences in Plaintiff's favor, this does not create a genuine issue of material fact because even if Plaintiff did receive awards, her productivity level was still rated as "unsuccessful" under the PACS system for a significant length of time.  To the extent that Plaintiff alleges that the 70% threshold is unlawful or illegitimate, this Court agrees with Judge O'Grady's assertion in *Hanson-Hodge I* that "[t]his Court cannot now weigh in on whether the 70% threshold is a wise or prudent standard to impose upon Plaintiff or other similarly situated [employees]."  *Hanson-Hodge I*, 2016 WL 595293, at *7.

Plaintiff next points to her salary increases in 2013 and 2014 as evidence that she was performing her job successfully despite Defendant's assertions to the contrary.  Specifically, Plaintiff points to her November 2013 pay increase from the U.S. Office of Personnel Management

---

[21] While Plaintiff did argue in her MSPB appeal that Rasey somehow fabricated Plaintiff's productivity ratings, ECF 20-29, at 19 (stating "Rasey just cited percentages off the top of her head"), Plaintiff does not make that claim before this Court.  ECF 1.  Those claims are pending review before the MSPB and even if this Court were to consider them, Plaintiff has provided no evidence to substantiate the claim that her productivity ratings were made up.

that stated, "work performance is at an acceptable level of competence." ECF 1-2, at 1. This raise came after Plaintiff's OPS plan ended and she was no longer barred from pay increases. *Id.* (effective date of pay increase was November 3, 2013); ECF 20-19, at 7 (noting Plaintiff's OPS plan concluded in August 2013). Plaintiff presents no evidence to suggest her pay raise was tied to merit, as opposed to longevity. *See* ECF 1, at 10. Without more information as to how the pay raises are calculated, implemented, and which departments are involved in pay scale decisions, mere evidence of a raise fails to generate a genuine dispute of material fact in light of the "overwhelming" evidence of Plaintiff's low productivity reports. *Vais Arms, Inc.*, 383 F.3d at 294.

On these facts, Plaintiff has not created a genuine dispute of material fact as to whether the Defendant acted with pretext in placing Plaintiff on a PA and OPS plan, as Plaintiff does not contest her poor productivity levels. *See Floyd v. N.Y. City Dep't of Educ.*, No. 10–CV–8951, 2014 WL 171156, at *12 (S.D.N.Y. Jan. 13, 2014) (granting summary judgment for defendant where plaintiff "has not produced any evidence to show that retaliation was the true basis for termination," and defendant's reason for termination, unsatisfactory performance, was "well-documented"). The Court is mindful of its responsibility to "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation omitted). As such, Defendant's Motion for summary judgment as to Plaintiff's retaliation claim is **GRANTED**.

### C.    Hostile Work Environment Under Title VII

Turning to the hostile work environment claim, as an initial matter, Plaintiff did not expressly allege a hostile work environment in her 2013 EEO complaint, which governs the scope of this Court's review. *See* ECF 1; *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022). The OFO only considered Plaintiff's allegation of retaliation; it did not consider whether Plaintiff demonstrated a hostile work environment. ECF 20-22. The Court will nevertheless address

Plaintiff's hostile work environment claim for two reasons.  First, Plaintiff's 2013 EEO complaint did allege that the Rasey was "harassing her about completing more cases" and did allege one incident in which Plaintiff was escorted out of the office by security, which may be considered "humiliating" and may represent the type of employment incident that may form the basis of a hostile work environment claim.  ECF 20-22, at 4-5; *Okoli*, 648 F.3d at 222.  Second, Plaintiff's complaint expressly alleged Defendant's actions created a "hostile work environment."  ECF 1, at 2.  Because we liberally construe *pro se* pleadings, the Court will address Plaintiff's hostile work environment claims and treat them as "reasonably related" to her EEO complaint.  *Walton*, 33 F.4th at 172.

Because the workplace environment is one of the "terms, conditions, or privileges of employment," Title VII creates a cause of action in favor of persons forced to work in a hostile workplace.  *See Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 64–67 (1986).  A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 272 (4th Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

To establish a prima facie case for a retaliatory hostile work environment claim,[22] a plaintiff must allege the conduct: (1) was unwelcome; (2) resulted because of her protected activity; (3) was sufficiently "severe or pervasive" to alter the conditions of her employment; and

---

[22] Plaintiff's complaint specifically alleges retaliation for prior and pending EEO activity.  ECF 1, at 2.  While Plaintiff speculates that race may have been a cause for the SSA instituting specific adverse employment actions against her, discussed *supra* Section III.A., she makes no allegation of a discriminatory hostile work environment.  ECF 1, at 2, 6–7.  While cognizant of the Court's mandate to liberally construe Plaintiff's pleadings, "[l]iberal construction . . . does not mean that the court should rewrite the complaint to include claims never presented."  *Gray*, 2017 WL 511910, at *2 (citing *Barnett*, 174 F.3d at 1132).

(4) was imputable to her employer.  *See Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009); *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 338 (4th Cir. 2003) (en banc).

The third element, requiring the conduct at issue to be "severe or pervasive," requires that the conduct create both an objectively and subjectively hostile work environment.  *Harris*, 510 U.S. at 21–22 (noting this standard is a "middle path between making any conduct actionable that is merely offensive and requiring the conduct to cause a tangible psychological injury"); *id.* at 22 (noting "[t]his is not, and by its nature cannot be, a mathematically precise test").  When evaluating hostile work environment claims, courts in the Fourth Circuit consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Okoli*, 648 F.3d at 222.

Plaintiff's hostile work environment claim is supported by the following allegations: (1) she was placed on performance improvement plans; (2) Rasey frequently met with Plaintiff regarding her performance measures; (3) Rasey made comments that Plaintiff interpreted as sarcasm; (4) Rasey asked Plaintiff to sign various documents; and (5) on one occasion Plaintiff was escorted out of the office by security after a confrontation with Rasey.  ECF 1.  The Court will address each in turn.

First, "corrective action to address an employee's professional shortcomings, even if misplaced, does not objectively create a hostile or abusive environment."  *Wedderburn*, 2022 WL 504511, at *13.  Plaintiff was placed on only one PA plan and one OPS plan by Rasey.  ECF 20-8 (PA plan); ECF 20-12 (OPS plan).  Placement on a PA plan is not a "severe" employment action because the employee is still considered "successful," and is still eligible for raises and promotions.  ECF 20-8, at 16.  The 30-day plan provides mentorship and support to employees who struggle to

meet performance objectives.  ECF 20-8, at 16–17.  Similarly, conducting meetings with an employee on a PA and OPS plan is one of the PACS requirements, designed to facilitate improvement.  *Id.*  While an OPS plan has more consequences, it too is a vehicle to provide additional support and assistance to employees that struggle meeting performance objectives.  *Cf. Pueschel*, 577 F.3d at 566 ("At bottom, a claimant must show that she is subject to "an *abusive working environment.*" (quoting *Harris*, 510 U.S. at 22)).  These corrective programs, designed to give employees specific goals and resources, cannot reasonably be cast as abusive.  Based on the totality of the circumstances, Plaintiff's placement on a PA and OPS plan is not "severe or pervasive" enough to rise to an actionable hostile work environment claim.

Second, "[i]t is established that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  *Singleton v. Dep't of Corr. Educ.*, 115 F. App'x 119, 122 (4th Cir. 2004) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (2004)); *see also Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002) (noting Title VII "is not designed to purge the workplace of vulgarity").  "Title VII is not intended to serve as a workplace civility code."  *Singleton*, 115 F. App'x at 122 (quoting *Faragher*, 524 U.S. at 788); *see also EEOC v. R & R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001) ("Boorish behavior may exist apart from any propensity to discriminate.").

In this case, Plaintiff points to a few offhand comments that are not sufficiently severe or pervasive to establish a prima facie case of a hostile work environment claim.  In one instance, in January 2014 after Plaintiff received a raise, Plaintiff alleges Rasey "angrily and sarcastically" said "Now you can go buy a house."  ECF 1, at 7.  Plaintiff also alleges Rasey told a security guard after a confrontation in October 2013, in which security had to be called, that she wished Plaintiff

had physically struck her so that she could fire Plaintiff.  *Id.* at 11.  Based on the totality of the circumstances, these offhand comments are not sufficiently severe or pervasive as to constitute an abusive working environment.  For instance, in *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6–7 (D.D.C. 2012), the United States District Court for the District of Columbia held that no reasonable jury could find a hostile work environment where a supervisor gave the plaintiff negative performance appraisals, criticized her, increased scrutiny of her work, raised his voice during meetings, slammed his hand on the table, angrily threw a notebook in her direction, and isolated her from her coworkers.  The conduct Plaintiff alleges here is far less egregious and more akin to "the ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 789.

However, Plaintiff does allege one incident that may be considered "humiliating." *Okoli*, 648 F.3d at 222.  In October 2013, during the government shutdown, Plaintiff was called on October 7 and asked to report for work on October 9 because the entire branch was exempted from furlough as "essential government employees."  ECF 20-24, at 12.  Rasey later received an email, on October 9, 2013, from an unknown individual in the personnel department, informing Rasey that employees on OPS plans—like Plaintiff—should be placed on furlough during the shutdown. *Id.* at 13.  Rasey's affidavit and the investigation conducted by the EEO indicated Rasey received this email without enough time to call Plaintiff and alert her not to come to work on October 9, 2013, and Rasey anticipated Plaintiff was already on her way in any event. *Id.*

When Plaintiff arrived, Rasey called Plaintiff into her office and informed her of her furlough status. *Id.*  Plaintiff was upset and went to her cubicle to gather her things, then returned to Rasey's office to ask what had changed. *Id.*  Rasey stated that Plaintiff was "very discourteous because [Plaintiff] interrupted a conversation [Rasey] was having with two Branch Chiefs." *Id.*  Rasey said Plaintiff was "very loud, verbally aggressive, and disrespectful" and that she "felt

threatened by her demeanor, her words and the tone and volume of her speech." *Id.*  Rasey said she believed "that the situation contain[ed] a potential for violence." *Id.*  Plaintiff then went back to her desk to call her husband and ask for the union representative's number, at which point Rasey called two security guards to escort Plaintiff out of the building. *Id.*  The SSA "admitted that [Rasey] made a mistake in calling [Plaintiff] to work and subsequently telling her to leave." *Id.* Plaintiff has not contested any of the factual allegations made herein.  *See* ECF 1; ECF 24.

As noted above, only "extremely serious" isolated incidents may amount to discriminatory changes in the "terms and conditions of employment" that may form the basis of a hostile work environment claim. *Faragher*, 524 U.S. at 788; *Faulkenberry v. U.S. Dep't of Def.,* No. 1:22-CV-01150-JMC, 2023 WL 3074639, at *12 (D. Md. Apr. 25, 2023) (holding plaintiff's allegations that she was escorted off work premises by security in view of other employees was not severe enough to establish a hostile work environment claim, noting "far worse is required"). *Cf. Hester v. Bd. Of Edu. Of Prince George's Cnty.*, No. TDC-22-0128, 2022 WL 7088293, *6 (D. Md. Oct. 12, 2022) (finding that allegations of physical attacks and threats were sufficient to support a claim of a severe and pervasive hostile work environment).  In both *Faulkenberry* and this case, the employee was escorted out of the building by a security guard.  The Court generally agrees with the conclusion reached in *Faulkenberry* that for an isolated incident to form the basis of a hostile work environment claim, "[f]ar worse is required." *Id.*  Such is not the case here.

Defendant's Motion to for summary judgment on Plaintiff's hostile work environment claim is **GRANTED.**

## IV.   <u>CONCLUSION</u>

In sum, Plaintiff's race discrimination claim fails because she cannot meet her burden to establish that she was satisfactorily performing her job at the time of her placement on performance improvement plans, and she has not alleged a similarly situated employee outside her protected

class received more favorable treatment.  Plaintiff's retaliation claim also fails because many of Plaintiff's complaints did not amount to materially adverse employment actions.  Even if Plaintiff could establish a prima facie case on the basis of her placement in performance improvement plans, Defendant has clearly provided a legitimate, non-retaliatory reason for Plaintiff's enrollment in these plans, which Plaintiff has failed to challenge as pretextual.  Finally, Plaintiff's hostile work environment claim fails because Plaintiff's isolated incident of being escorted from the building after a confrontation with Rasey is not sufficiently "severe" to create a hostile work environment, and other offhand comments Plaintiff alleges Rasey made are no more than ordinary workplace tribulations that Title VII is not designed to address.

Defendant's Motion, styled as a motion to dismiss or, in the alternative, for summary judgment is treated as a motion for summary judgment and is **GRANTED.** A separate implementing Order follows.

Dated: December 1, 2023                     _____/s/_____
                                            Brendan A. Hurson
                                            United States District Judge